UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - -X

MEYER CORPORATION U.S.,

                        Plaintiff,                    ORDER

        - against -
                                    2010-cv-3647 (CBA)(MDG)

ALFAY DESIGNS, INC. and
AL SMALDONE, individually,

                        Defendants.

- - - - - - - - - - - - - - - - - -X

APPEARANCES:
    Dean A. Dickie, Esq.
    Ryan C. Williams, Esq.
    Miller, Canfield, Paddock and Stone P.L.C.
        225 West Washington Street, Suite 2600
    Chicago, Illinois 60606
    *Attorneys for Plaintiff*

    Howard M. Rubin, Esq.
    Joel G. MacMull
    Goetz Fitzpatrick
    One Penn Plaza, Suite 4401
    New York, New York 10119
    *Attorneys for Defendant*

GO, United States Magistrate Judge:

    In this action brought under the diversity jurisdiction of this

Court, Plaintiff Meyer Corporation U.S. ("Meyer") asserts claims

against defendants Alfay Designs, Inc. ("Alfay") and Al Smaldone

arising from defendants' alleged tortious interference with

plaintiff's license agreement with Farberware, Inc. ("Farberware")

for the sale of certain tea kettles.  See Plaintiff's Third Am.

Compl. (DE 31) ¶ 2.  The claims and disputes in this vigorously

litigated action have been the subject of numerous rulings and will

not be recounted here.

This Order addresses the remaining component of plaintiff's Motion for Sanctions with respect to certain conduct occurring at a deposition of Jayme Smaldone, the son of defendant Al Smaldone, held on October 12, 2012. <u>See</u> DE 101. This Court addressed most of the issues raised in plaintiff's motion at a hearing held on January 15, 2013, and ruled, <u>inter alia</u>, that sanctions against defendant Al Smaldone were not warranted with respect to his conduct in making suggestive gestures and uttering a profanity during questioning by Mr. Dean Dickie, plaintiff's counsel. <u>See</u> Minute Order of the Court filed on Jan. 17, 2013 (DE 117). However, the Court was not able to determine on the basis of written submissions that part of the plaintiff's motion for sanctions based on its claim that Al Smaldone took the cellular phone of Mr. Dickie during the deposition. After the parties failed in their attempts to settle the dispute, this Court held an evidentiary hearing on May 2, 2013. <u>See</u> Minute Entry dated May 6, 2013; transcript of hearing attached as Exh. 1 to plaintiff's post-hearing Findings of Fact (DE 132-1).

In an electronic order filed on May 16, 2013, this Court granted the motion for sanctions against defendant Al Smaldone with respect to the disappearance of Mr. Dickie's phone, but denied plaintiff's request that the Court strike defendants' answer. This Order sets forth the Court's findings of fact and reasons for the ruling, as well as describes the sanctions imposed against defendants.

Plaintiff called five witnesses who were all present at the deposition of Jayme Smaldone: Ryan Williams, plaintiff's counsel; Dean Dickie, plaintiff's counsel who conducted the deposition; Dean Krause, general counsel for plaintiff; Daniel Macom, a videographer employed by Ellen Grauer Court Reporting, who videotaped the deposition; and Sophie Nolan, a court reporter also employed by Ellen Grauer Court Reporting who transcribed the deposition.  Defendant called defendant Al Smaldone, who was also present at the deposition and the subject of the motion at issue.

The parties do not dispute that a deposition of Jayme Smaldone was held on October 12, 2012 and that all six of the above-named witnesses were present, along with Ellen August, counsel for defendants.  Tr. at 7 (DE 132-1).  The parties took a break some time in the afternoon and resumed around 3:51 p.m.  Tr. at 36.  Both sides also agree that some time after the deposition continued, Al Smaldone got up, walked to the back of the room, and stood behind the seated videographer before leaving the room through the door nearest the back of the room.  Tr. at 18-19, 38-39 (Williams); 52-53 (Nolan); 72, 74 (Krause); 117 (Smaldone).  He returned to the deposition room a few minutes minutes later.  Tr. at 19 (Williams); 39 (Macom); 53 (Nolan); 94 (Dickie).

According to plaintiff's witnesses, shortly before the deposition resumed, the videographer asked if he could power off a phone that had been placed on a table behind him and was

ringing during the break.  Tr. at 15-16 (Williams), 50-51 (Nolan), 72 (Krause), 92 (Dickie); Affidavit of Daniel Macom ("Macom Aff.") at ¶ 4 (DE 101-6).  After Mr. Dickie said the phone was his and asked the videographer to turn it off, the videographer powered off the phone and placed the phone back on a credenza.  Tr. at 15 (Williams), 32 (Macom), 49-50 (Nolan), 72 (Krause), 92 (Dickie);  Macom Aff. at ¶ 5 (DE 101-6).  After the deposition broke again at 4:23 p.m., Mr. Dickie went to get his phone at the back table and announced that his phone was missing. Tr. at 21 (Williams), 40-41 (Macom), 49-50, 53 (Nolan), 76 (Krause), 94 (Dickie).  In the ensuing search for the phone, Mr. Dickie found it wrapped in paper towels and hidden in a closed cabinet above the opening of a paper towel dispenser in the men's restroom.  Tr. at 55 (Nolan), 77-78 (Krause), 94, 98-99 (Dickie).

Mr. Macom, Ms. Nolan, and Mr. Krause testified that after the deposition resumed on the record at 3:51 p.m., everybody attending the deposition was in the conference room and seated. Tr. at 35, 37 (Macom); 51 (Nolan); 72 (Krause).  All of plaintiff's witnesses testified that nobody other than Al Smaldone left or entered the room between the resumption of the deposition at 3:51 p.m. and the next break at 4:23 p.m.  Tr. at 19 (Williams), at 39 (Macom), 53-55 (Nolan), 75-76 (Krause), 94 (Dickie).  Plaintiff contends in its motion that Al Smaldone was the person who took Mr. Dickie's cell phone and hid it.

In his testimony, Mr. Smaldone denied taking the cell phone or even seeing it on the back table of the conference room.  Tr.

at 118, 120.  He also denied entering the men's restroom after he had stepped out.  <u>Id.</u> at 118-20.  He did not recall hearing any exchange involving the videographer's request to turn off the cell phone, nor could he recall whether anyone else had entered or exited the room during the deposition during the time in question.  <u>Id.</u> at 120-21, 124-25.  Instead, he testified that because his water bottle was empty, he went to the back of the room to get water, but the bottles there were empty.  <u>Id.</u> at 117. He stayed and stood behind the videographer for a few minutes to look at his son through the camera before leaving the room to ask a receptionist outside where he could get water.  <u>Id.</u> at 117-18. After getting a bottle of water from a smaller conference room, he returned to the deposition room.  <u>Id.</u> at 118.

I found that the plaintiff's witnesses were credible and provided a plausible and consistent version of the events at issue.[1]  Ms. Nolan, the court reporter, and Mr. Macom, the videographer, were particularly believable, since they were clearly disinterested witnesses.  Despite defendants' attempt to show their bias, these two witnesses plainly did not have any

---

[1] There were a few, but minor, inconsistencies in the testimonies of plaintiff's witnesses.  For example, the witnesses differed as to the length of time that Mr. Smaldone spent in the back of the room.  <u>Compare</u> Tr. at 18-19 (Mr. Williams, testifying that Mr. Smaldone was in the back of the room for 5-10 minutes); Tr. at 38 (Mr. Macom, four to five minutes); Tr. at 74 (Mr. Krause, 2-5 minutes).  Ms. Nolan also initially misidentified the attorney who announced that he had found the phone.  <u>See</u> Tr. at 67-68.

relationship with the plaintiff or its attorneys, and had no reason to lie under oath. Tr. at 29 (Macom), 49 (Nolan).

In contrast, I did not find Mr. Smaldone credible at all, both because of his demeanor and manner in testifying and because of what he said. He gave, at best, confused testimony[2] and had selective memory as to certain details, but not others.[3] Given his conduct before the incident, I did find believable that he would leave his seat to go to the back of the room for water, and then depart from the deposition room. As portions of the transcript and video excerpts of earlier interactions involving Al Smaldone during the deposition make clear, he was very involved in the deposition, following the questioning closely, and reacting. See DE 101-2 (deposition transcript) and 101-8

---

[2] For example, he testified in direct examination that: "And so I was behind the videographer. I went to the right side of the table [and] I was looking at the camera." Tr. at 117. In cross examination, he gave the following answers:

Q:      So it is your testimony, Mr. Smaldone, that you were never standing behind the videographer to his left shoulder during the time in which you were standing at the back of the conference room?

A.      I was looking at the cameras. So, you know, I might have been over his shoulder at one point because he was next to camera. I don't know where I was positioned.

Q.      Mr. Smaldone, I want to know is it your testimony that at the time that you [] got up and walked to the back of the conference room, you never stood to the left of the videographer, at the location in close proximity to the cell phone?

A:      I don't recall.

Tr. at 122-23.

[3] For example, Mr. Smaldone was able to recall details about his conversation with the receptionist, Tr. at 118, while being unable to recall whether anyone entered or left the room during his son's deposition. See Tr. at 123.

(video submitted in support of other parts of plaintiff's motion); see also, Tr. at 73-75 (Mr. Krause testifying that Al Smaldone had been voluble and very involved while Jayme Smaldone testified).  In light of Mr. Smaldone's earlier behavior during the deposition, it is not believable that he would leave the deposition room simply to get water, particularly since he did so not long after a break had been taken.  See Tr. at 55 (Ms. Nolan testifying that "the whole thing was just strange . . . leaving and coming back"); 75 (Mr. Krause testifying Mr. Smaldone's departure "peculiar" because he had been very engaged in the deposition and they "had just taken a break"); 122 (Mr. Smaldone admitting he had been an active participant).

Thus, as further elaborated below, I find that Al Smaldone took Mr. Dickie's cell phone from the conference room and hid it in the cabinet above the opening of the paper towel dispenser in the men's restroom.

## FINDINGS OF FACT

The deposition of Jayme Smaldone on October 12, 2012 was held in a conference room with an elongated table with the longer sides slightly curved and straight ends, as depicted in Plaintiff's Exhibit 15.  See Tr. at 7 (Williams), 31 (Macom), 48 (Nolan),  69 (Krause), 90 (Dickie); Pl.'s Exhs. 1C, 1D, 1H, 15.  Jayme Smaldone sat at one end, with Ms. August and Al Smaldone to his right at the side of the table.  Ms. Nolan sat at the side to the left of the deponent, followed by Mr. Dickie, Mr. Williams and Mr. Krause.  Mr. Macom, the videographer, was at the

end of the table opposite Jayme Smaldone.  Tr. at 9 (Williams);
31 (Macom), 49 (Nolan), 69 (Krause), 91 (Dickie) (all confirming
the seating arrangement of the attendees as indicated by Mr.
Williams on a blow up of Plaintiff's Exhibit 15).  There is a
long credenza extending along the wall behind Mr. Macom, and two
doors along the wall to the left of Mr. Macom and behind Ms.
August and Al Smaldone at each end of the room.  Pl. Exh. 1H, 1K,
15; Tr. at 9 (Williams), 31 (Macom), 49 (Nolan), 69 (Krause),
91 (Dickie).

     As the attendees were about to reconvene at about 3:51 p.m.,
following a break in the deposition, Mr. Macom said that a cell
phone on the table behind him was ringing and asked to turn it
off.  Tr. at 15 (Williams), 32 (Macom), 50 (Nolan), 72 (Krause),
92 (Dickie).  The phone, an iPhone, was plugged into an outlet
near the end of the table behind Mr. Macom to his left and near
the door.  Tr. at 33-34 (Williams), 46 (Macom); Pl.'s Exh. 1B,
1G.  Mr. Dickie said the phone was his and asked Mr. Macom to
power it off.  Id.  Mr. Macom, who was familiar with iPhones,
powered the phone off and set it back down on the table to let it
continue charging.  Tr. at 33-34 (Macom), 51 (Nolan),
72 (Krause), 92-93 (Dickie).

     At some point after questioning resumed, Mr. Smaldone stood
up and walked to the back of the room.  Tr. at 18-19 (Williams),
37-38 (Macom), 51-52 (Nolan), 72-74 (Krause), 93 (Dickie).  He
stood for a few minutes to the left of Mr. Macom, facing the
conference table and with his back close to the cell phone on the

credenza.  Tr. at 18-19 (Williams), 37-38 (Macom), 51-52 (Nolan),
72-74 (Krause), 93 (Dickie).  As Mr. Smaldone stood there, he was
"moving around behind" Mr. Macom, and Mr. Macom felt
uncomfortable having somebody close behind him while he worked.
Tr. at 38.  Mr. Smaldone had his hands behind his back, Tr. at
18-19 (Williams), 93 (Dickie), and was reaching behind with his
hands.  Tr. at 74 (Krause).  Mr. Smaldone then left the
deposition room through the door to the left of the videographer,
and returned to the room several minutes later through the other
conference room door behind Ms. August.  Tr. at 19-25 (Williams),
39 (Macom), 52 (Nolan), 94 (Krause), 117, 119 (Smaldone).

     At the request of Jayme Smaldone, the participants took
another break in the deposition at 4:23 p.m.  Tr. at 20-21
(Williams), 40 (Macom), 53 (Nolan), 76 (Krause), 94 (Dickie).
During the time the deposition was in session between 3:51 p.m.
and 4:23 p.m., everyone remained in his seat, except for Mr. Al
Smaldone.  Tr. at 39-40.  Other than Mr. Smaldone, no one had
entered the room during that period.  Id. at 40.  Just after the
break began, Mr. Dickie went to the back of the room to get his
cell phone, but found only the case without the phone.  Tr. at 21
(Williams), 53-54 (Nolan), 76 (Krause), 94-95 (Dickie).  Mr.
Dickie announced that the phone was missing and asked Mr. Macom
what happened to the phone.  Tr. at 40 (Macom), 95 (Dickie).  Mr.
Macom said he had placed the phone back on the table after
powering it off.  Tr. at 40.  The empty phone case had apparently
been placed on the table face down and the phone cord was still

plugged into the outlet in the wall, with the plug at the other end of the cord placed in the bottom slot of the phone case so it appeared to the witnesses that the phone was in the case.  Tr. at 40 (Macom); 54, 59 (Nolan); 77 (Krause); 95-96 (Dickie).

At Mr. Dickie's request, Mr. Williams called the phone and heard it ring multiple times, instead of going straight to voicemail.  Tr. 21-22 (Williams), 96-97 (Dickie).  Mr. Krause also called the phone and heard it ring multiple times instead of going to voicemail. Tr. at 77-78 (Krause).  Because the phone had been powered off by Mr. Macom prior to resumption of the deposition at 3:51 p.m., the phone would not have rung unless it had been turned on.  Tr. at 33-34 (Macom), 21-22 (Williams), 77-78 (Krause), 97 (Dickie).

Mr. Krause went to the men's restroom to search for the phone and while there, heard the phone vibrating.  Tr. at 54-55 (Nolan), 78-79 (Krause).  After Mr. Krause began digging through the garbage under a paper towel dispenser, Mr. Dickie entered the men's restroom.  Tr. at 78-79 (Krause), 98 (Dickie).  The paper towel dispenser unit appears to be similar to models found in other public restrooms, and is made of stainless steel with an upper cabinet unit having an opening at the bottom from which paper towels can be removed and a bottom receptacle for used towels.  Plaintiff's Exhibit 2A-2C.  As the men were talking, they heard the phone vibrating again and Mr. Dickie joined in searching through the garbage.  Tr. at 79 (Krause), 98 (Dickie).  Mr. Krause then exited the men's restroom, but Mr. Dickie

remained.  Tr. at 79-80 (Krause), 98-99 (Dickie).  Upon hearing

the phone ring again, Mr. Dickie tried to reach into the opening

of the paper towel dispenser from the opening for pulling out

paper towels.  Tr. at 99.  He could feel the phone vibrating, but

could not reach far enough into the opening to get the phone.

Id.  Mr. Dickie then opened the cabinet door above the opening of

the paper towel dispenser and discovered the phone standing

upright among the paper towels.  Id.; Plaintiff's Exhibit 2A-2C.

The phone was completely wrapped and concealed in several paper

towels.  Tr. at 57 (Nolan), 99 (Dickie); Pl's Exh. 1A.  The phone

still worked and had not been crushed or damaged in any way.  Tr.

at 101 (Dickie).  The phone was password protected.  Tr. at 104.

After discovering the phone, Mr. Dickie re-entered the

conference room and announced that he had located his phone. Tr.

at 22 (Williams), 41-42 (Macom), 56 (Nolan), 90 (Krause), 101

(Dickie).  Mr. Dickie then adjourned the deposition, after which

Mr. Williams called the police to report that the phone had been

stolen.  Tr. at 23 (Williams), 101-102 (Dickie).  Mr. Dickie, Mr.

Williams, Mr. Krause, Mr. Macom, and Ms. Nolan were still present

when the police arrived, but Al Smaldone and Ms. August had

departed.  Tr. at 26 (Williams), 56 (Nolan).

Based on the foregoing facts, I conclude that Mr. Smaldone

was the person who removed Mr. Dickie's phone from its case and

from the charger, while standing behind Mr. Macom.  He then set

the case of the phone face down back on the table, laying the

plug of the charger inside the case so it would appear that the

phone was still charging there.  I also find that after he
surreptitiously removed Mr. Dickie's phone from the conference
room, Mr. Smaldone went into the men's restroom.  He turned the
phone on but was unable to access information on the phone.  He
then wrapped the phone in paper towels and placed it standing up
in the cabinet space above the paper towel dispenser.

Defendants point to the absence of a named suspect on the
police report and argue that this is significant, either because
the police did not believe that Mr. Smaldone had committed the
crime or because no one who spoke with the police suggested that
Mr. Smaldone had taken it.  Tr. at 130 (Mr. Rubin's closing
argument).  I disagree since I am doubtful that the officers had
the benefit of the testimony given at the hearing or were
interested in spending time investigating the theft of a cell
phone that had been recovered.  Accordingly, I also find that Al
Smaldone gave false testimony to this Court both in his
declaration submitted with defendants' opposition to plaintiff's
motion and in his testimony at the evidentiary hearing.

## CONCLUSIONS OF LAW

Plaintiff requests numerous sanctions for Mr. Smaldone's
misconduct, the most severe of which is the striking of
defendants' answer, effectively granting default judgment.  <u>See</u>
ct. doc. 101, at 12.

As the Second Circuit has recognized, "a court has the
inherent power to supervise and control its own proceedings and
to sanction counsel or a litigant for bad-faith conduct."

Sussman v. Bank of Israel, 56 F.3d 450, 459 (2d Cir. 1995)
(citing Chambers v. NASCO, Inc., 501 U.S. 32, 46 (1991)); see
also Walpert v. Jaffrey, 2015 WL 5092619, at *12 (S.D.N.Y. Aug.
28, 2015). Since plaintiff seeks the drastic sanction of
striking defendants' answer, I apply the more stringent "clear
and convincing" standard in determining whether there is
misconduct here to warrant this or other sanctions sought. See
Revson v. Cinque & Cinque, PC, 221 F.3d 71, 79 (2d Cir. 2000)
(requiring showing of "clear evidence that the challenged
actions" are taken for improper purposes, "and a high degree of
specificity in the factual findings" when sanction for bad faith
is imposed (citations omitted)); Shepherd v. Am. Broadcasting
Companies, 62 F.3d 1469, 1476-78 (D.C. Cir. 1996) (discussing
cases requiring "heightened standard of proof"); McMunn v.
Memorial Sloan-Kettering Cancer Center, 191 F. Supp. 2d 440
(S.D.N.Y. 2002) (applying "clear and convincing" standard to
misconduct warranting dismissal).

I find that the evidence of Mr. Smaldone's misconduct is
clear and convincing. Based on the credible evidence presented,
Mr. Smaldone was the only person who had the opportunity to take
the phone, since all the others remained seated and no one
entered the room between 3:51 p.m. until the next break. He was
also the only person in the conference room who had the
opportunity to hide the phone in the men's restroom. Needless to
say, he also had the motivation to take the phone in order to
access information of his adversaries' attorney. Setting aside

whatever interests the attorneys for plaintiff may have had at the time, the Court finds implausible that the videographer and court reporter would conspire with them to present false testimony to the Court.

As for the question of the sanction of default judgment requested by the plaintiff, the "[c]ases in which courts have struck pleadings, or entered judgment against a party, have generally involved intentional misconduct that has materially and negatively affected the resolution of an action." Walpert, 2015 WL 5092619, at *12 (collecting cases). Among the factors that courts in the Second Circuit consider in determining whether to impose such severe sanctions for misconduct include:

> (1) whether the misconduct was the product of intentional bad faith; (2) whether and to what extent the misconduct prejudiced the other party; (3) whether there is a pattern of misbehavior, rather than an isolated instance; (4) whether and when the misconduct was corrected; and (5) whether further misconduct is likely to continue in the future.

Sanchez v. Litzenberger, 2011 WL 672413, at *4-*5 (S.D.N.Y. 2011). In addition, courts examine whether "the deception relates to matters in controversy in the action." Id. at *5.

Analyzing Mr. Smaldone's conduct under these factors, this Court finds that striking the defendants' answer and entry of default judgment in favor of plaintiff is not warranted. Although Mr. Smaldone's theft of the phone was intentional and taken in bad faith to gain a tactical advantage, none of the other factors weigh in favor of entering default. Critically, there has been no prejudice to plaintiff or any effect, let alone

material impact, on the merits of the claims in this action. Mr. Dickie testified that the phone was password protected, Tr. at 104, and plaintiff presents no evidence that Mr. Smaldone had accessed the phone. Although Mr. Dickie suggests that Mr. Smaldone hid the phone with the intention of later attempting to gain access to it at his leisure, Tr. at 104-05, that did not happen.

Moreover, in spite of ongoing friction between Mr. Smaldone and plaintiff's counsel during the deposition, there is no indication that Mr. Smaldone engaged in an ongoing pattern of serious misconduct during this case. This appears, instead, to be an instance of Mr. Smaldone seizing an opportunity that presented itself at the deposition after a long and acrimonious day.

Courts have imposed the harsh sanction of dismissal or entry of default only in the most severe situations of misconduct that materially affect the merits of a case. For example, the court in <u>Cerruti 1881 S.A. v. Cerruti. Inc.</u>, 169 F.R.D. 573 (S.D.N.Y. 1996), struck the defendants' answer and counterclaims, and entered judgment for plaintiffs on the merits, where defendants produced fraudulent records in response to discovery demands. <u>Id.</u> at 583-84; <u>see</u> <u>also</u> <u>Blum v. Schlegel</u>, 1996 WL 925921, at *2, *9-*13 (W.D.N.Y. 1996) (case dismissed because of plaintiff's inability to comport himself in a respectful manner or comply with Court orders where the plaintiff violated a protective order governing the use of the confidential information, cooperated

with extreme reluctance with the Court and opposing counsel, and constantly hurled highly abusive language at opposing counsel and the Court); McMunn, 191 F. Supp. 2d at 446, 462 (plaintiff gave extensive false deposition testimony and discovery responses and furthermore altered audiotapes that she produced to the defendant, including information which went to the heart of plaintiff's claims); Perna v. Electronic Data Sys., 916 F. Supp. 388, 389, 392 (D.N.J. 1995) (one individual plaintiff's claim was dismissed after that plaintiff, an attorney, photocopied papers belonging to opposing counsel during a break in a deposition).

Plaintiff in this case argues that the situation in Perna is analogous to the theft of Mr. Dickie's phone. This Court disagrees and finds it significant that plaintiff suffered no prejudice in this case because Mr. Smaldone was not able to access the phone. In Perna, the defendant was clearly prejudiced by the plaintiff's photocopying of its papers.

Nonetheless, serious sanctions are warranted to punish defendants for both the theft of the phone, and Mr. Smaldone's apparent lack of remorse and willingness to give false testimony to the Court.[4] Litigation cannot proceed in an orderly fashion

_____

[4] This Court is constrained to note that the conduct of Mr. Smaldone, sadly, reflects the unnecessarily contentious manner in which this litigation has proceeded. Far too many motions to compel and for sanctions have been filed, a number of which should not have been made had the parties, particularly plaintiff, been more concerned with meeting discovery obligations, and had counsel attempted to be proceed with more courtesy toward each other. For example, after having twice granted defendants' motion to compel, this Court ultimately imposed a $2,500 sanction on plaintiff, a ruling that Chief Judge Amon affirmed. See DE 50, 61; Meyer Corp. U.S. v. Alfay Designs, Inc., 2012 WL 372013 (E.D.N.Y. 2012). This
(continued...)

if parties are forced to expend effort physically protecting their documents and other possessions.

Courts have imposed lesser sanctions than dismissal on a wide variety of misconduct involving dishonesty. For instance, where a former plaintiff, who was also the husband and father of then-current plaintiffs, submitted altered CT scans and audiotapes to defendants, a court gave the jury an instruction that plaintiff had offered fabricated evidence and imposed a monetary sanction consisting of defendants' expenses in making the motion. Jung v. Neschis, 2009 WL 762835, at *3, *23-24 (S.D.N.Y. 2009). In a similar situation, where a plaintiff produced false evidence during discovery and submitted additional false evidence to the court, the court ordered plaintiff to pay defendants' motion expenses and indicated that defendants could submit a jury charge with an adverse instruction before trial. Rezender v. Citigroup Global Markets, 2011 WL 1584603, at *4, *6-*7 (S.D.N.Y. 2011). Where the principal of a corporate defendant fabricated evidence, gave false testimony, failed to correct inaccurate discovery responses and continued to deny engaging in

<hr>

(...continued)
Court subsequently imposed sanctions upon plaintiff for producing an inadequate Rule 30(b)(6) witness, and, although declining to impose sanctions upon Mr. Dickie for his conduct in interfering with the deposition of a different employee of plaintiff, this Court sternly warned plaintiff's counsel on proper behavior in future depositions. See DE 89; Meyer Corp. U.S. v. Alfay Designs, Inc., 2012 WL 3536987 (E.D.N.Y. 2012). To be sure, such conduct cannot and does not afford Mr. Smaldone an excuse for his larcenous and ill-considered conduct. However, this Court views both the conduct at issue and the resulting motion as another example of excessive effort devoted to matters totally unrelated to the merits of the claims here.

any such misconduct, a judge in this district imposed a $100,000 sanction against the principal and corporate defendant. Amerisource Corp. v. Rx USA Intern., 2010 WL 2730748, at *2-*3, *7-*8 (E.D.N.Y. 2010). Similarly, where key witnesses for the government misrepresented their credentials and counsel tried to cover up the false statements, the Fourth Circuit reversed dismissal but permitted an award of defendants' motion fees. U.S. v. Shaffer Equip. Co., 11 F.3d 450, 463 (4th Cir. 1993).

Even in cases where one party has accessed information belonging to an opposing party or counsel, courts often decline to take the drastic step of dismissing a claim. See Fayemi v. Hambrecht and Quist, Inc., 174 F.R.D. 319, 323, 326 (S.D.N.Y. 1997) (plaintiff copied information from supervisor's computer after plaintiff was terminated; court precluded plaintiff from using that information); Maldonado v. New Jersey, 225 F.R.D. 120, 124-25, 141 (D.N.J. 2004) (plaintiff found letter containing privileged information and gave it to his attorneys, who did not notify defendants of their possession; court disqualified counsel); Glynn, 2010 WL 3294347, at *1-*3 (plaintiffs received internal information from defendant corporation from a current employee and asserted the common interest privilege over the information in bad faith; court imposed $20,000 sanction); Ashman v. Solectron Corp., 2008 WL 5071101, at *2, *4 (N.D. Cal. 2008) (plaintiffs accessed internal e-mails and documents of corporate defendant; court barred plaintiffs from using the information and awarded defendants' fees).

Accordingly, after analyzing the circumstances of Mr. Smaldone's conduct and other cases involving similarly serious misconduct, dishonesty and attempted access to private information, I find that plaintiff is entitled to an adverse jury instruction and a monetary sanction of reasonable attorneys' fees. Since this incident does not bear directly on the merits of the claims in this case, the jury instruction should only state that Mr. Al Smaldone presented false testimony to the Court after attempting to gain access to plaintiff's private information.

I also find that an award of attorneys' fees is appropriate. In post-hearing submissions, plaintiff provided specific billing records to support the amount of fees sought, while defendants objected both to the imposition of fees and the reasonableness of the fees and costs sought. Pl's Supp. Brief (DE 152); Defs' Supp. Brief (DE 154). Plaintiff's counsel seeks attorneys' fees in the amount of $80,193 and costs in the amount of $13,356.83, for time and money expended in litigating this motion. Pl's Supp. Brief at 1, 8. Defendants argue that the fees and costs sought are excessive and unreasonable, and are based on inflated hourly rates and without contemporaneous time records. See Defs' Supp. Brief.

The standard method for determining the amount of reasonable attorneys' fees is the lodestar method, which is based on "the number of hours reasonably expended on the litigation multiplied by a reasonable hourly rate." Hensley v. Eckerhart, 461 U.S.

424, 433 (1983); <u>Arbor Hill Concerned Citizens Neighborhood</u>
<u>Ass'n</u>, 522 F.3d 182, 184, 188–90 (2d Cir. 2008).

In assessing the reasonableness of fees sought, the court
"must examine the particular hours expended by counsel" with a
view to "the value of the work product of the particular
expenditures to the client's case." <u>DiFilippo v. Morizio</u>, 759
F.2d 231, 235 (2d Cir. 1985); <u>see</u> <u>also</u> <u>Adorno v. Port Auth. of</u>
<u>New York and New Jersey</u>, 685 F. Supp. 2d 507, 515 (S.D.N.Y. 2010)
(analyzing the merits, success and ultimate contribution to
litigant's case of various billing entries).  If any expenditure
of time was unreasonable, the Court should exclude these hours
from the calculation.  <u>See</u> <u>Hensley</u>, 461 U.S. at 434; <u>Lunday v.</u>
<u>City of Albany</u>, 42 F.3d 131, 133 (2d Cir. 1994).  The Court
should thus exclude "excessive, redundant or otherwise
unnecessary hours, as well as hours dedicated to severable
unsuccessful claims." <u>Quaratino v. Tiffany & Co.</u>, 166 F.3d 422,
425 (2d Cir. 1999).  "If a court finds that the fee applicant's
claim is excessive, or that time spent was wasteful or
duplicative, it may decrease or disallow certain hours, or where
the application for fees is voluminous order an across-the-board
percentage reduction in compensable hours." <u>Spalluto v. Trump</u>
<u>Int'l Hotel & Tower</u>, 2008 WL 4525372, at *6 (S.D.N.Y. Oct. 2,
2008); <u>Santa Fe Natural Tobacco Co. v. Spitzer</u>, 2002 WL 498631,
at *3 (S.D.N.Y. Mar. 29, 2002).

A party seeking attorneys' fees bears the burden of
supporting its claim of hours expended by accurate, detailed and

contemporaneous time records.  New York State Ass'n for Retarded Children, Inc. v. Carey, 711 F.2d 1136, 1147–48 (2d Cir. 1983); see also Saunders v. City of New York, 2009 WL 4729948, *5 (S.D.N.Y. Dec. 9, 2009).  Because billing records that aggregate multiple tasks in one entry make it difficult for a court to assess the reasonableness of the hours billed, courts in this Circuit have found it appropriate under such circumstances to reduce hours across the board by some percentage.  LV v. New York City Dep't of Educ., 700 F. Supp. 2d 510, 525 (S.D.N.Y. 2010); see also Molefi v. Oppenheimer Trust, 2007 WL 538547, at *7-8 (E.D.N.Y. Feb. 21, 2007); Sea Spray Holdings, Ltd. v. Pali Fin. Grp., Inc., 277 F. Supp. 2d 323, 325-26 (S.D.N.Y. 2003).

Additionally, "courts in the Second Circuit regularly reduce attorneys' fees by 50 percent for travel time." Adusumelli v. Steiner, 2013 WL 1285260, at *5 (S.D.N.Y. Mar. 28, 2013) (citing LV v. N.Y.C. Dep't of Educ., 700 F. Supp. 2d 510, 526 (S.D.N.Y. 2010) (internal quotations omitted)).

As a preliminary matter, I find that the hourly rates of $400 for Mr. Dickie, a partner, and $250 for associates Ryan Williams and Gregory Kubly, are reasonable, albeit on the high end of what is commonly awarded in this district.  "[T]he prevailing hourly rate for partners in this district ranges from $300.00 to $400.00, and a reasonable hourly rate for a senior associate ranges from $200 to $300." Marshall v. Deutsche Post DHL, 2015 WL 5560541, at *9 (E.D.N.Y. Sept. 21, 2015); see Flores v. Mama Lombardi's of Holbrooke, Inc., 104 F. Supp. 3d 290, 313

(E.D.N.Y. 2015) (awarding $350 for a senior partner, $200 for junior partners and associates, and $75 for paralegals); <u>Griffin v. Astro Moving & Storage Co. Inc.</u>, 2015 WL 1476415, at *8 (E.D.N.Y. Mar. 31, 2015) (reasonable hourly rates are $300 to $450 for partners, $200 to $325 for senior associates, and $100 to $200 for junior associates); <u>Cho v. Koam Med. Servs. P.C.</u>, 524 F. Supp. 2d 202, 207 (E.D.N.Y. 2007) (hourly rates range from $200 to $350 for partners, $200 to $250 for senior associates, $100 to $150 for junior associates, and $70 to $80 for legal assistants). Because the hourly rate of $90 for the paralegal services of Paula Orr is slightly higher than is commonly awarded, her rate is reduced to $80 per hour.

In its supplemental papers, plaintiff seeks fees for 132.2 hours of time spent preparing the motion and reply, as well as 158.8 hours spent preparing and conducting the evidentiary hearing. <u>See</u> Pl's Billing Records (DE 152-1). Additionally, plaintiff seeks 11.5 hours in fees for time spent preparing the findings of fact submitted post-hearing. <u>Id.</u>

Before considering the reasonableness of the actual hours worked, I note that Mr. Dickie and Mr. Williams both billed their full rate for travel time on January 14, 2013 and April 29, 2013. <u>See</u> Pl's Billing Records at 11-13. Mr. Williams, but not Mr. Dickie, billed at full rate for travel on January 15, 2013 and May 3, 2013. <u>See id.</u> at 13. In most of the entries, the time charged included other work without a breakdown of time attributable to travel. <u>Id</u>. at 11-13. However, Mr. Williams

billed 7.5 hours on May 3, 2013 with no other tasks listed in the billing entry. Id. at 13. Because 7.5 hours is reasonable for traveling between New York and Chicago, I will reduce the hourly rate for time reasonably spent traveling between Chicago and New York to 7.5 hours per instance. Thus, the 15 hours of travel time for Mr. Dickie and the 30 hours for Mr. Williams should be billed at half their hourly rate, which amounts to $3,000 for Mr. Dickie and $3,750 for Mr. Williams, for a total of **$6,750**.

Turning to the reasonableness of non-travel hours worked, I note that the motion for sanctions included several other claims, and this Court did not award fees as to those portions of the motion. See DE 101 at 3-7, 16-18 (raising other objections to deposition conduct other than the theft of the phone). In general, the billing records presented to the Court contain large blocks of time accompanied by multiple, sometimes vague notations of activity that make it impossible for the Court to parse out how much time was spent on each activity, thereby preventing the Court from evaluating the reasonableness of the time expended. See Pl's Billing Records at 8-13. For example, one entry for Mr. Dickie on January 15, 2013 is for a 12-hour block, described with a notation that reads, "Meet with Christina Pan; prep for hearing; telephone call with Dean Krause; post mortem with Ryan Williams re position going forward." Pl's Billing Records at 11. Another 12-hour block, billed on April 29, 2013 is accompanied by a notation that reads, "Evidentiary Hearing prep in New York City; review Al Smaldone deposition transcript, exhibits

-23-

submitted by Defendants, draft witness outlines." Id. at 12. A separate entry for Mr. Williams for a 12-hour block reads simply, "Prepare for Evidentiary Hearing in NY." Id. at 13.

With respect to the time spent preparing the motion, because the billing records contain vague entries and block billing, coupled with the fact that the other portions of the sanctions motion not related to the theft of the phone are severable, I find appropriate a reduction of 50 percent of the hours of time claimed for preparation for the motion and reply, which shall be applied after deducting 15 hours travel time for Mr. Williams and 7.5 hours for Mr. Dickie, as previously discussed. Quaratino, 166 F.3d at 425; see Lunday, 42 F.3d at 134. With such a reduction to 54.85 hours of billable time for work on the motion itself, not including travel, 50.1 hours is allowed for Mr. Williams and Mr. Kubly, the associates working on the case; 2.4 hours for Mr. Dickie, the partner on this case; and 2.35 hours for Paula Orr, the assigned paralegal. See Pl's Billing Records. Such adjustments result in fees of $12,525 for the associates, $960 for Mr. Dickie, and $188 for Ms. Orr, for a total of **$13,673** for fees relating to preparation of the motion papers and reply.

The billing records for the time spent preparing for the evidentiary hearing suffer from the same block-billing practices. I also find an expenditure of 124.5 hours in preparation for the evidentiary hearing (147 hours claimed less 22.5 hours of travel time) to be excessive for a half-day proceeding involving a straightforward and factual dispute about a few events occurring

in the span of less than two hours.  Thus, I find that a 30

percent reduction of the hours spent preparing for and

participating in the hearing is appropriate.  Such a reduction,

after subtracting 22.5 hours spent on travel, results in reduced

hours of 52.85 for the associates, 29.4 for Mr. Dickie, and 4.9

hours for Ms. Orr, for a total of 87.15 hours.  Those reduced

hours yield fees of $13,212.50 for the associates, $11,760 for

Mr. Dickie, and $392 for Ms. Orr, for a total of **$25,364.50**.

I find that the time spent on the findings of fact is

appropriate and award fees for such work of $2,875 for the

associates' time, and $120 for Mr. Dickie's time, for a total of

**$2,995**.

In light of the foregoing, plaintiff is awarded a total of

**$48,782.50** in fees.

With respect to the costs assessed, I find that the cost of

the transcript and video of the Jayme Smaldone deposition,

totaling $3,669.65, is not recoverable.  Had there been no

misconduct by Al Smaldone, plaintiff would have still incurred

such costs.  Additionally, the amounts claimed for lodging costs

in New York are too high.[5]  Plaintiff seeks recovery of costs for

Mr. Dickie's room, billed at $625 per night plus taxes, and for

Mr. Williams' room billed at a rate of $395 per night, plus

_____

[5] Defendants object to payment of such costs, but this Court
observes that plaintiff did not choose to have this action litigated
in this district. Plaintiff initially filed this action in the Eastern
District of California, which was dismissed in that district for lack
of personal jurisdiction following a motion by the defendants, and
refiled in this jurisdiction.  This Court declines to penalize the
plaintiff for electing to proceed in this litigation with its original
counsel located in Chicago.

taxes.  <u>See</u> Pl's Billing Records at 27-28.  Because the plaintiff
could have obtained a room for Mr. Dickie at the $395 per night
rate, plaintiff may only recover costs for 2 rooms at the $395
per night rate, plus taxes and hotel fees.  Additionally, the
plaintiff's counsel apparently stayed in New York for 4 nights,
which is longer than is reasonable for a half-day hearing and
related preparation. Thus, plaintiff may recover costs for only 3
nights' stay.  In total, plaintiff may recover costs of $2,780.36
for their accommodation during the hearing.  Finally, the cost
for the demonstrative exhibit used during the hearing should not
be recoverable.  Such an elaborate chart is not necessary in a
bench trial to establish the arrangement of furniture and seating
of attendees, none of which was disputed at the hearing.

For the reasons stated, plaintiff may recover a total of
**<u>$5,588.80</u>** in costs.

## CONCLUSION

For the foregoing reasons, plaintiff's motion for sanctions regarding the theft of Mr. Dickie's cell phone is granted in part and denied in part. Plaintiff is entitled to an adverse jury instruction and attorneys' fees in the amount of $48,782.50 and costs in the amount of $5,588.80.

**SO ORDERED.**

Dated:      Brooklyn, New York
            February 26, 2016


                                    _/s/_____
                                    MARILYN D. GO
                                    UNITED STATES MAGISTRATE JUDGE